Filed 6/18/26  P. v. Edwards CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAHEEM ABDUL EDWARDS,<br><br>    Defendant and Appellant. | G064688<br><br>(Super. Ct. No. 04NF4451)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Michaela Dalton, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Daniel Rogers and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Appellant.

In 2011, defendant Raheem Abdul Edwards was sentenced to life in prison without parole after he was convicted of special circumstances felony murder for participating in a burglary/robbery during which his cohort, Robert Feeney, fatally shot the owner of a liquor store. In this appeal, Edwards challenges the denial of his petition for resentencing following an evidentiary hearing under Penal Code section 1172.6.[1] Edwards contends there is insufficient evidence to support the trial court's finding he was a major participant in the underlying felonies and acted with reckless indifference to human life for purposes of the current felony-murder rule. We disagree and affirm the court's denial order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE ORIGINAL TRIAL PROCEEDINGS

At Edwards's trial, there were two sources of evidence about what happened inside the liquor store during the fatal shooting, Edwards himself, and a three-minute surveillance video. We start with the video, which consisted of only images, without sound.

*A. The Surveillance Video*

The video shows Edwards and Feeney entering the Lucky 7 liquor store in Anaheim on the morning of December 15, 2000. They are wearing beanie caps and gloves, and Haeng Shin Kim, the owner and only other person in the store, is standing behind the checkout counter to their

---

[1] That section originally was housed in Penal Code section 1170.95, but it subsequently was renumbered without substantive change as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) For ease of reference, we refer to the current provision. All undesignated statutory references are to the Penal Code.

2

left. Posing as customers, Edwards and Feeney start taking items from the store shelves and placing them on the checkout counter. But, around the one-minute mark, Edwards walks to a storage area in the back of the store, out of sight of the surveillance camera. Then Feeney briefly converses with Kim before walking out the front door of the store.

With Feeney gone, Kim leaves the checkout counter and walks to the back storage area, where Edwards went. Then Feeney reenters the store and walks to the same area. At that point, all three men are out of sight of the surveillance camera.

Twenty seconds later, Kim reappears from the back storage area, crawling on his knees. He struggles to his feet and starts hobbling toward the front of the store in front of the checkout counter. Edwards comes out from the back storage area right after Kim and immediately goes behind the checkout counter and starts taking money from the two cash registers. While Edwards is rummaging through the registers, Kim falls to the floor and starts crawling toward the front door. But before he gets there, Feeney reemerges from the back of the store, moves quickly to Kim, and shoots him in the back of the neck, leaving him motionless on the floor. This shot comes about 10 seconds after Kim emerged from the back storage area on his knees.

After that, Feeney closes the front door and runs to the back of the store, but Edwards stays behind the checkout counter and continues taking money from the registers for another 15 seconds before joining Edwards in the back. Fifteen seconds later, the two emerge from the back of the store and hastily exit through the front door, stepping over Kim in the process. They can be seen running from the store just over three minutes from the time they initially entered it.

*B. The Initial Investigation and Edwards's Police Interview*

The police were summoned, and upon arriving at the store, they found Kim lying in a pool of blood just inside the front door. In addition to the bullet wound to the back of his neck, Kim had a second bullet wound in his lower back. He was pronounced dead at the scene. Investigators found six .45-caliber shell casings in the store. One was by Kim's body, and the others were in the back of the store, where a storage area, a bathroom, and a small office are located.

The police arrested Edwards in Michigan five years later, in 2005. After waiving his *Miranda* rights (see *Miranda v. Arizona* (1966) 384 U.S. 436), Edwards told investigators he was living with Feeney and Feeney's mother at the time of the shooting. Edwards said he and Feeney were "like brothers," that they would "share everything," and that Feeney would "tell me everything."

According to Edwards, he worked the graveyard shift at Disneyland the night before the shooting. He got home around 7:30 a.m., just as Feeney was coming out of their house. Feeney told Edwards he was going to get some extra money and "do a robbery." Edwards decided to go with him because he did not want to have to answer to Feeney's mother if something bad happened to Feeney.

They ended up walking to the Del Monte area of Anaheim, which was a couple of miles from their house. Along the way, Feeney mentioned something about borrowing money from some guys he knew there. But when they got there, Feeney started talking about robbing Kim's liquor store, which was located in that area. Knowing the store cashed checks, Feeney figured Kim would have a lot of money on hand for that purpose because it was a Friday.

Edwards agreed to assist in the robbery. The plan was for him to lure Kim to the back of the store and distract him there so Feeney could steal the money from the cash registers. Before entering the store, they surveilled it from a bus stop across the street. They waited until the store was empty of customers before embarking on their plan.

Upon entering the store, Edwards lured Kim to the back storage area, as planned. Instead of hitting the cash registers, however, Feeney walked to the back storage area as well. Describing events to the police, Edwards said he was standing in the corner of the back storage area, trying to distract Kim, when he heard several gunshots. Feeney then told him to grab the money, so he darted behind the checkout counter and started taking money from the cash registers. Then he ran for the front door, jumped over Kim, and pulled his cap down as he left the store with Feeney.

Following the robbery, Edwards and Feeney split the loot, which consisted of a few hundred dollars and some food stamps. Then they fled to Las Vegas for about a week, before making it out to New York, where Edwards has family.

Edwards told the police he did not have a gun during the robbery and did not know Feeney was armed. Edwards admitted, however, that he knew Feeney liked guns, had books on guns, and always wanted to be around them. Edwards also said that he had seen Feeney with a gun on more than one prior occasion.

## C. Edwards's Trial Testimony

At his 2011 trial, Edwards testified in greater detail about what happened on the day back in 2000 when he and Feeney robbed Kim's liquor store. Contrary to what he said during his police interview, Edwards testified that when he and Feeney set out for the Del Monte area that morning,

5

Feeney was just looking to borrow money from a friend; he did not say anything about committing a robbery. However, Edwards could not remember the name of the person from whom Feeney was hoping to borrow money.

When they got to Del Monte, Feeney knocked on several doors in an apartment complex, but no one he knew was around. Feeney and Edwards then started getting nervous about staying in that area. They had not done anything wrong up to that point, but they did not want to linger around the apartment complex for fear of being arrested for trespassing. So, they walked over to a bus stop and sat on a bench across the street from Kim's liquor store.

Eyeing the store, Feeney told Edwards he could steal the register money if Edwards would lure Kim to the back of the store. Edwards thought Feeney was joking at first, but when Feeney persisted with the idea, Edwards told him, "I'm not doing that." Edwards also offered to give Feeney some of his own money, to dissuade Feeney from stealing money from the store, but Feeney declined the offer.

For the next 30 minutes or so, they sat on the bench watching customers going in and out of Kim's store. Edwards told Feeney the store was too busy to try to steal Kim's money, and Feeney seemed to begrudgingly agree. Sensing Feeney's disappointment, Edwards offered to buy him some cigars and liquor at the store, to make him feel better. Edwards testified Feeney was on board with that idea. Despite all of Feeney's talk about stealing Kim's money, Edwards believed he had successfully talked Feeney out of the idea by the time they crossed the street and entered Kim's store.

Upon entering the store, however, Edwards could not find the particular kind of liquor Feeney liked.[2] Therefore, Edwards went into the back storage area to look for it, and Kim followed him. At that point, Edwards realized Feeney might be able to steal the register money after all. Although Edwards testified that was *not* the plan when they entered the store, he decided to stall Kim in the back by asking him questions about his inventory, to give Feeney time to steal the money.

But Feeney did not go for the money. Instead, he went into the back storage area and started shooting. Despite being in that area himself, Edwards testified he did not see Feeney at that time. Edwards also claimed he had no idea Feeney had a gun, let alone that he would shoot Kim. Edwards told the jury he was "shocked" when he heard he first shot go off. Then several more shots rang out in rapid succession and everything seemed to start happening very fast.

After Kim fell to the floor and started crawling out of the storage area, Feeney shouted for Edwards to "grab the money." Edwards testified initially that he obeyed the command out of fear Feeney might turn the gun on him. But, during his subsequent testimony, Edwards admitted he did not really believe Feeney was going to shoot him; that was just something that *could* have happened from a hypothetical standpoint if he did not follow Feeney's directive. In any event, Edwards ran out of the back room after Kim crawled out and went directly to the cash registers.

Edwards testified he was so busy taking the money from the cash registers he did not see Feeney shoot Kim a second time by the front door.

---

[2] At trial, Edwards described the liquor as "white," but he could not remember what kind or brand it was.

7

After emptying the registers, Edwards joined Feeney at the back of the store and gave Feeney the money. They were hoping to escape through the back door, but it was locked, so they ran back through the store and, after stepping over Kim's body, left through the front door. Along the way, Edwards noticed Kim was lying in a pool of blood. Edwards testified he felt bad for Kim, but he did not try to help him or call 911 because he thought Kim was already dead.

During his testimony, Edwards claimed he was upset over the situation and felt betrayed by Feeney for shooting Kim. But when he brought up the prospect of calling the police, Feeney told him he would have to go to jail too, so Edwards did not do that. Instead, he and Feeney stayed in the area for about a week until they saw a report about the shooting on the news. At that point, they went to Las Vegas and then took a bus to New York. Edwards testified he fled with Feeney and shared the robbery loot with him because he wanted Feeney to trust him. Fearing possible repercussions, he did not want Feeney to think he might report him to the police.

Consistent with his pretrial police interview, Edwards testified he knew Feeney was a gun enthusiast. However, although he told the police he had seen Feeney with a gun on more than one occasion prior to the Kim shooting, Edwards testified at trial he had only seen Feeney with a gun one time before then, when Feeney had showed him a shotgun at their house. Asked to explain this discrepancy, Edwards stated he "could have been misinterpreted" during his police interview. Edwards also admitted he had previously been convicted of a felony involving moral turpitude and that he gave the police a false name when he was arrested in connection with this case.

*D. The Verdict and Sentence*

The jury convicted Edwards of first degree murder and found true the special circumstances allegations that he committed the murder during the commission of a burglary and during the commission of a robbery. The trial court sentenced him to life in prison without parole, and on direct appeal, a panel of this court affirmed the judgment in its entirety. (*People v. Edwards* (June 21, 2012, G045022) [nonpub. opn.], review denied Sept. 26, 2012, S204354.)

II.

THE RESENTENCING PROCEEDINGS

In 2019, seven years after his conviction was affirmed on appeal, Edwards filed a petition for resentencing pursuant to section 1172.6. The petition was based on changes to the felony-murder rule that had been ushered in by Senate Bill No. 1437 the previous year. (Stats. 2018, ch. 1015, § 4.) That bill narrowed the scope of the felony-murder rule such that an accomplice to a felony during which death occurs can only be found liable for murder if: (1) he was the actual killer, (2) he aided and abetted the actual killer with the intent to kill, or (3) he was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subd. (e)(1)–(3); Stats. 2018, ch. 1015, § 3.)

After finding Edwards made a prima facie showing for resentencing, the trial court issued an order to show cause and set the matter for an evidentiary hearing. Neither party offered any new evidence at the hearing, and the matter was submitted on the record of conviction, including Edwards's police interview and the transcript of his trial. Considering all the circumstances surrounding the shooting, the court found Edwards was a major participant in the burglary/robbery and acted with reckless

9

indifference to human life. The court therefore denied Edwards's petition for resentencing.

The trial court made extensive factual and credibility findings in conjunction with its ruling. Although Edwards testified Feeney never raised the prospect of stealing money from Kim until they were sitting on the bus bench across from Kim's store, the court did not believe that because Edwards told the police Feeney had mentioned doing a robbery about an hour earlier, when they were still back at their house. And although Edwards testified he had talked Feeney out of that plan and they entered the store simply to buy cigars and liquor, the court was skeptical of that in light of what transpired inside the store, i.e., Edwards lured Kim to the back storage area, just as he and Feeney had talked about on the bus bench. In other words, despite Edwards's testimony to the contrary, the court found he was knowingly and actively involved in the heist from the get-go.

In assessing Edwards's culpability (and credibility), the trial court also found it suspicious that Edwards and Feeney were wearing caps and gloves when they entered the store. Considering as well how much time they spent watching the store from the bus bench, the court found the heist was preplanned, and Edwards "played a major role in deciding how and when to commit the crime regardless of whether it was initially his idea."

In addition, the trial court found Edwards knew Feeney was armed when they entered Kim's store. This finding was based on several factors. First, Edwards told the police he and Feeney were very close friends at the time of the robbery and shared everything with one another. Given their tight relationship, the court found it not credible that Feeney did not tell Edwards something as important as the fact he had a gun. The second factor relates to Edwards's testimony about why he and Feeney left the

apartment complex where Feeney was trying to borrow money and walked to the bus stop across from Kim's store. Edwards claimed it was simply because they did not want to get arrested for trespassing. But given Edwards's lack of credibility on other matters, the court determined he was probably more concerned the police would find Feeney's gun if they did arrest him for something.

Beyond that, the trial court questioned whether Edwards and Feeney even went to the apartment complex before the robbery. Edwards testified they went there looking for someone Feeney could borrow money from. But the court doubted that because Edwards could not remember the name of the person Feeney was trying to find, and Feeney declined Edward's offer of money while they were sitting on the bus bench prior to the robbery.

In Edwards's defense, the trial court noted there was no evidence he was armed during the robbery or that he supplied Feeney with the gun Feeney used to shoot Kim.[3] Nor was there any evidence Feeney had a history of violence or that Edwards had any reason to suspect Feeney would use deadly force during the robbery. However, the court found the location of the bullet casings in the back of the store indicated Edwards was much closer to Feeney at the time of the initial gunshots than Edwards let on during his testimony.

In analyzing the major participant issue, the trial court also found it significant that, after Feeney initially shot Kim, it was Edwards who

---

[3] Based on Edwards's pretrial statements to the police, the trial court made a finding that Edwards had gifted Feeney a gun at some point before the shooting. We agree with the parties there is insufficient evidence to support this finding. However, because the timing of the purported gift was unknown, the court did not rely on it as proof Edwards had supplied Feeney with the gun he used to shoot Kim.

11

cleaned out the cash registers, albeit at Feeney's request; Edwards did not attempt to assist or protect Kim in any way. And following their escape, Edwards shared the robbery money with Feeney and eventually fled the state with him. Edwards testified he did so because he was afraid of what Feeney might do to him if Feeney sensed he was not in his corner. But the trial court found that testimony not credible given how close Edwards and Feeney were at the time of the shooting.

Turning to the reckless indifference to human life requirement, the trial court relied on many of the same factors it cited in finding Edwards was a major participant in the underlying felonies. In particular, the court found: (1) Edwards *purposely* lured Kim to the back of the store as part of a preconceived plan; (2) Edwards made no effort to minimize the risk of violence to Kim; (3) Edwards did not try to help Kim after Feeney initially shot him, nor did he stop to see if Kim was still alive when he stepped over Kim's body to exit the store; and (4) although the entire incident lasted only a few minutes, Edwards was heavily involved in the events that led to Kim's death.

The trial court also found: Edwards "testified that he was upset by the shooting, but was able to go to sleep that night, work the next morning and otherwise carry on with his life as if nothing had happened. This shows a callousness [that] belies his youth, as he only sprang into action when he saw the reports of the murder on the news and decided to leave town with Feeney." Despite the fact Edwards was only 20 years old at the time of the shooting, the court found he would have understood Kim's bullet wounds required immediate medical attention and that failing to assist Kim or call for help after he was shot could have lethal consequences.

12

All things considered, the trial court found Edwards's attempt at trial to minimize his involvement or to mitigate or excuse his behavior was unconvincing and the evidence proved beyond a reasonable doubt he was guilty of murder under the current felony-murder rule.

## DISCUSSION

Edwards contends there is insufficient evidence to support the trial court's ruling. As we explain below, however, there is overwhelming evidence in the record to support the court's finding Edwards was a major participant in the underlying felonies. And although the evidence supporting the reckless indifference requirement is not as strong, it is sufficient to sustain the court's order.

## I.

### STANDARD OF REVIEW

When the trial court denies a resentencing petition following an evidentiary hearing, we review the court's order under the substantial evidence standard. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) In doing so, we assess the evidence "'in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [court] could reasonably have deduced from the evidence.'" (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.) Although the evidence must be "reasonable, credible, and of solid value" (*People v. Jones* (1990) 51 Cal.3d 294, 314), we must remember "'it is the exclusive province of the [trial court] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "'"If the circumstances reasonably justify the findings made . . . reversal of the judgment is not warranted simply because the circumstances might also

reasonably be reconciled with a contrary finding.""" (*People v. Lucero* (2019)
41 Cal.App.5th 370, 411.)

## II.

### THE MAJOR PARTICIPANT AND RECKLESS INDIFFERENCE REQUIREMENTS

The major participant and reckless indifference requirements
stem from a pair of United States Supreme Court cases, *Enmund v. Florida*
(1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137
(*Tison*). In those decisions, the high court considered under what
circumstances the death penalty could be imposed on a person "who aids and
abets a felony in the course of which a murder is committed by others but
who does not himself kill, attempt to kill, or intend that a killing take place
or that lethal force be employed." (*Enmund, supra*, 458 U.S. at p. 797.)

Earl Enmund was just such a person. After hatching a robbery
plan, he drove his cohorts to the victim's house and waited nearby while they
confronted the victim at gunpoint. When the victim's wife appeared with a
gun of her own, the cohorts shot and killed her, as well as the intended
victim. Enmund then drove his cohorts from the scene and helped them get
rid of their guns. Focusing on Enmund's conduct and culpability, the United
States Supreme Court determined that because he played a minor role in the
actual robbery and lacked the intent to kill, he could not be subjected to the
death penalty, even though the victims were murdered during the course of a
serious felony—armed robbery—that he planned and facilitated. (*Enmund,
supra*, 458 U.S. at pp. 798–801.)

In *Tison*, the defendants' conduct was more egregious, although,
like Enmund, they too harbored no murderous intent. The defendants in
*Tison* were two brothers who sprang their father, Gary, and another
convicted murderer, Randy, from prison during an armed confrontation with

14

guards. Following the breakout, the group flagged down a car, captured its occupants at gunpoint, and took their belongings. Then Gary and Randy shot and killed them while the defendants looked on from a distance. The group evaded authorities for several days but eventually was apprehended after a shootout with the police. The question presented was whether the defendants—nonkillers who lacked the intent to kill but were heavily involved in the armed breakout and kidnapping for robbery—could lawfully be put to death for the murders committed by Randy and their father. (*Tison, supra,* 481 U.S. at pp. 138–141.)

The high court answered that question in the affirmative, explaining the defendants' "own personal involvement in the crimes was not minor, but rather, as specifically found by the trial court, 'substantial.' Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery [a la Enmund], each [defendant] was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the [victims] and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158.) Equally important, the facts demonstrated the defendants had reason to know lethal force might be used, yet they did nothing to restrain the killers or aid the victims. (*Id.* at pp. 151–152.) The court found their "reckless indifference to the value of human life [was] every bit as shocking to the moral sense as an 'intent to kill.'" (*Id.* at p. 157.)

In the wake of *Tison*, the California electorate passed Proposition 115, which amended section 190.2 to allow the felony murder special circumstance to be applied to a person who was not the actual killer so long as he acted "with reckless indifference to human life and as a major participant" in the underlying felony. (§ 190.2, subd. (d); see Prop. 115, as

15

approved by the voters, Primary Elec. (June 5, 1990).) That amendment, which amounted to a statutory codification of the *Tison* decision, was already on the books when Edwards was convicted in 2011. However, it was not until several years later, in *People v Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) that the California Supreme Court fully examined the meaning of the terms "'major participant'" and "reckless indifference" to provide "a deeper understanding" of how they should be applied in a given case. (*Banks,* at p. 801.)

The facts in *Banks* were akin to those in *Enmund* in that the defendant served as the getaway driver for an armed robbery in which his confederate shot and killed a person who resisted the robbery. In examining the parameters of the major participation requirement, the *Banks* court explained, "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in *Tison* . . . and *Enmund* . . . represent points on a continuum. [Citation.] Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks, supra*, 61 Cal.4th at p. 802.)

The *Banks* court then articulated several factors bearing on the major participation requirement: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a

16

position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.) The court stated, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation . . . was sufficiently significant to be considered 'major' [citations]." (*Ibid.*)

Applying these factors to the defendant's actions in *Banks*, the Supreme Court found his conduct failed to satisfy the major participant requirement because he was not involved in planning the robbery, he did not procure weapons for the shooter, neither he nor the other participants had any history of violent crime, he was not present at the scene of the shooting, and there was "no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks, supra*, 61 Cal.4th at p. 805.)

The *Banks* court also addressed the mens rea requirement for the felony murder special circumstance. While acknowledging there is an inherent risk of death in all armed robberies, the court stated risk alone is not enough to support a finding of reckless indifference. Rather, the evidence must establish the defendant engaged in conduct that is ""known to carry a *grave risk of death*."' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the *significant risk of death* his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801, italics added.) The California Supreme Court found that standard was not met in *Banks* because, unlike the situation in *Tison*, there was no evidence the defendant "knowingly conspired with accomplices known to have killed

17

before. Instead, as in *Enmund*, [the fatal shooting] was apparently a spontaneous response to armed resistance from the victim." (*Id*. at p. 807.)

In *Clark*, the Supreme Court further elaborated on the reckless indifference requirement. Clark planned and organized the closing-time robbery of an Orange County computer store and was orchestrating events from his car in the parking lot when the mother of one of the victims unexpectedly entered the store. An accomplice in the store promptly shot her dead, leading to Clark's conviction for special circumstances felony murder under aiding and abetting principles. Without deciding whether Clark was a major participant in the underlying robbery, the Supreme Court noted there is significant overlap between the major participant requirement and the reckless indifference requirement, "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark, supra*, 63 Cal.4th at p. 615.)

This overlap was further elucidated when the court articulated the factors it considered pertinent to the reckless indifference analysis, namely, "the defendant's knowledge of weapons, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offense conduct, that is, 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant'; the defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime." (*In re Miller* (2017) 14 Cal.App.5th 960, 973, quoting *Clark, supra*, 63 Cal.4th at pp. 618–623.) As it did in enunciating the major participant factors in *Banks*, the Supreme Court in *Clark* made clear none of these factors were necessary, or necessarily sufficient, to satisfy the reckless indifference requirement in a given case. (*Clark, supra*, 63 Cal.4th at p. 618.)

18

On balance, however, the Supreme Court concluded those factors militated against a finding Clark acted with reckless indifference. The court found it significant the sole gun used in the robbery held a single bullet and was carried by an accomplice, not Clark. (*Clark, supra*, 63 Cal.4th at p. 619.) In addition, although Clark was nearby at the time of the shooting, he was not physically present at the scene, rendering him unable to prevent it. (*Ibid*.) Furthermore, there was no evidence Clark ordered the shooting or wanted it to occur. (*Id*. at pp. 619–621.) In fact, the evidence suggested the opposite in that Clark planned the robbery to take place after the store was closed (*ibid*.), and he thought the gun was unloaded (*id*. at p. 613). The Supreme Court determined those circumstances warranted reversal of the special circumstance findings because, at bottom, there was nothing about the planning and nature of the robbery "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id*. at p. 623.)

Further refining the meaning of reckless indifference, the California Supreme Court recently explained in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*) that this element "encompasses both subjective and objective elements. [Citations.] 'As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create."' [Citations.] 'As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'"' [Citations.]

"'The degree of risk to human life is crucial to the analysis.' [Citation.] . . . "'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death'" satisfies the statutory requirement.' [Citations.] . . . [P]articipation in a "'garden-variety armed robbery,'" i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel, supra,* 17 Cal.5th at p. 884.)

In *Emanuel*, our Supreme Court noted the defendant's youth has also been recognized as a pertinent factor in determining whether he acted with reckless indifference to human life for purposes of the current felony-murder rule. (*Emanuel, supra*, 17 Cal.5th at p. 885, fn. 6.) A finding of reckless indifference cannot stand if the defendant's age precluded him from possessing the experience, perspective, and judgment to adequately appreciate the risk of death posed by his criminal activities. (*In re Moore* (2021) 68 Cal.App.5th 434, 454.)

### III.

### ANALYSIS

#### A. The Major Participant Requirement

Contending he played only a minor role in the burglary/robbery that led to Kim's death, Edwards argues his involvement in the crimes was no greater than that of an ordinary aider and abettor. We disagree. The record shows Edwards was actively involved in the underlying felonies from start to finish.

Edwards told the police he agreed with Feeney to divert Kim's attention in the back of the store so Feeney could steal the register money.

20

And that is just what Edwards did when he entered the store. As Edwards admitted at trial, he was trying to stall Kim in the back storage area when Feeney initially shot Kim. Edwards testified the shooting was not part of their plan, and he was shocked when he heard the first shots go off. But rather than abandoning the plan at that point, Edwards jumped into action and carried out an essential component of the robbery—taking the register money—while Feeney fired a second bullet into the back of Kim's neck.

Following that second shot, Feeney ran to the back of the store, leaving Edwards free to check on Kim or even flee the store if he really was shocked and appalled by Feeney's barrage of gunshots. Instead, Edwards stayed behind the checkout counter and continued cleaning out the registers, demonstrating his commitment to the deadly heist. Edwards also fled with Feeney and shared the spoils of the robbery with him.

Unlike Feeney, Edwards did not personally inflict any harm on Kim during the incident. But like the defendants in *Tison*, who were found to be major participants in the kidnapping/robbery at issue in that case, Edwards "was actively involved in every element of the [burglary/robbery] and was physically present during the entire sequence of criminal activity culminating in the murder of [Kim] and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158.) As such, there is ample evidence to support the trial court's finding Edwards was a major participant in those felonies.

B. *The Reckless Indifference Requirement*

The sufficiency of the evidence on the reckless indifference requirement is a closer issue. As we explained above, to satisfy this requirement, the prosecution must prove the defendant was willingly involved in the violent manner in which the underlying felony was committed and consciously disregarded the significant risk of death his conduct created.

21

(*Emanuel, supra,* 17 Cal.5th at p. 884.) "[P]articipation in a "'garden-variety armed robbery,'" i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient *without more* to establish reckless indifference." (*Ibid.*, italics added.)

In this case, however, there *is* more. Based on the trial court's factual findings, Edwards was not only heavily involved in the burglary/robbery, he knew Feeney was armed. This was a reasonable inference from the evidence because Edwards told the police he and Feeney were very close and shared everything with each other. In his police interview, Edwards also admitted he knew Feeney liked guns and he had seen Feeney with a gun on more than one prior occasion. Under these circumstances, and given that Edwards's trial testimony was suspect for other reasons noted by the trial court, the court was justified in rejecting Edwards's claim that he did not know Feeney was armed when they entered Kim's liquor store.

As discussed above, Edwards also played a key role in the burglary/robbery by luring Kim to the back of the store and then raiding the cash registers after Feeney initially disabled Kim with a bullet to his lower back. These facts stand in stark contrast to those in *Emanuel*, where the defendant was unaware his cohort was armed and he actually tried to defuse the situation by urging his cohort to leave the scene with him after they were met with unexpected resistance during their intended robbery. (*Emanuel, supra*, 17 Cal.5th at pp. 885–896.) Although the California Supreme Court overturned a reckless indifference finding under those circumstances, Edwards's culpability far exceeds that of the defendant in *Emanuel* in terms

22

of both his mental state and his level of participation in the underlying felonies.

Granted, the robbery in this case unfolded quickly after Feeney opened fire in the back storage area. But Edwards still had a reasonable opportunity to alter the course of events after the initial shots. Even if he did not know Feeney was armed going in and had no reason to suspect Feeney might shoot Kim while they were in the store, there was no excuse for Edwards's callous indifference to Kim once he realized Kim was wounded from the initial volley of gunshots.

At trial, Edwards testified his own safety became an issue at that point because Feeney could have shot him had he not complied with Feeney's directive to grab the money. But Edwards admitted that was simply a hypothetical possibility and he did not really believe in the moment that Feeney was going to shoot him. So, in reality there was nothing stopping Edwards from attempting to aid Kim or trying to restrain Feeney from further violence.

Alternatively, Edwards could have simply run out the front door of the store if he was truly shocked by what Feeney had done and wanted no further part in the plan. Instead, Edwards dashed out of the back room just behind Kim and ran straight to the cash registers. This shows Edwards was aware of and willingly involved in the violent manner in which the burglary/robbery was perpetrated. (Compare *People v. Guiffreda* (2023) 87 Cal.App.5th 112 [insufficient evidence of reckless indifference to human life where the subject robbery was a spontaneous crime of opportunity, the defendant had no reason to suspect lethal force might be used, and the defendant quickly left the scene once she saw her cohorts using such force].)

We recognize only about 10 seconds elapsed from the time Feeney initially shot Kim in the back of the store until the time Feeney shot Kim in the back of the neck near the front of the store. Yet, "although the opportunity for intervention may have been brief," Feeney "made [his] intentions clear, affording [Edwards] 'the time to observe and react before the'" final shot was fired. (*Emanuel, supra*, 17 Cal.5th at p. 892, discussing *In re Loza* (2017) 10 Cal.App.5th 38, 53 [reckless indifference to human life found where the defendant did not try to restrain his codefendant after the codefendant "demanded money from the clerk while counting down from five and threatening to shoot"] and *In re McDowell* (2020) 55 Cal.App.5th 999, 1014–1015 [reckless indifference to human life found where the defendant failed to intervene after codefendant fired warning shot a few seconds before fatally shooting robbery victim].)

Of course, there is no way of knowing if Kim would have survived if Edwards had reacted differently to the situation. However, in assessing the blameworthiness of Edwards's actions following the initial volley of shots, "The focus should not be on the ultimate *efficacy* of his actions" in terms of being able to aid Kim or restrain Feeney from further violence, "but on what his actions reveal about his mental state." (*Emanuel, supra*, 17 Cal.5th at p. 891.) By choosing to raid the cash registers instead of trying to deescalate or remove himself from the situation, Edwards made his indifference to Kim's life clear. (See *Tison*, supra, 481 U.S. at pp. 151–152 [reckless indifference found where defendants failed to assist the victims after the shooting and instead chose to assist the killers in their continuing criminal activity]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 4–10 [reckless indifference found where defendant continued stealing money after codefendant shot and wounded clerk during robbery].)

24

Edwards did tell the police he and Feeney waited until there were no customers inside Kim's store before going inside to carry out their plan. This suggests they may have timed their actions to mitigate the risk to others, akin to the defendant in *Clark*, who planned to rob a retail store with his associates after it was closed. But it is equally likely Edwards and Feeney timed the heist to avoid being confronted or identified by potential customers inside the store. In any event, Edwards testified the store was very busy when he and Feeney were casing it from the bus bench across the street. Despite their efforts to avoid entering the store while other customers were present, there was no assurance others would not enter the store while the heist was underway and be swept up in the deadly violence that occurred during their crimes.

Another potentially mitigating circumstance is Edwards's age. As the trial court recognized, Edwards, like Feeney, was only 20 years old at the time of the robbery. It is now well established that, compared to older adults who commit crimes, juvenile and young adult offenders are considered less culpable because they often lack maturity and have ""an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influence and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" (*Graham v. Florida* (2010) 560 U.S. 48, 68, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 569–570; see also *People v. Caballero* (2012) 55 Cal.4th 262, 266 [discussing why juvenile offenders have greater prospects for reform compared to older offenders].)

But, according to Edwards, he went along with Feeney on the morning of the robbery to look after him, not because Feeney pressured him to do so. Edwards, who was a working adult at the time, even tried to reason with Feeney (including offering to give Feeney some of Edward's own money)

25

in an attempt to talk him out of stealing from Kim's store. There is nothing to suggest Edwards's age precluded him from understanding the deadly risks associated with carrying out the heist. (Compare *People v. Keel* (2022) 84 Cal.App.5th 546, 560–562 [reversing reckless indifference finding absent evidence the subject robbery was planned or the 15-year-old defendant had any idea it would actually take place]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991–992 [15-year-old defendant lacked the experience and maturity to appreciate the grave risks associated with his criminal actions]; *In re Moore, supra*, 68 Cal.App.5th at pp. 451–455 [holding similarly in the case of a 16-year-old defendant].)

Considering the totality of the circumstances, there is substantial evidence to support the trial court's finding Edwards acted with reckless indifference to human life in helping Feeney carry out the burglary/robbery. It is not just that Edwards affirmatively assisted Feeney during the crimes by luring Kim to the back of the store and emptying the cash registers. Equally important is that Edwards failed to make any effort to assist Kim or call for help after Kim was shot by Feeney. Because Edwards's actions and inaction during the burglary/robbery demonstrate he was recklessly indifferent to Kim's life, there is no reason to disturb the trial court's finding to that effect.

In coming to this conclusion, we recognize Edwards testified he was an unwitting accomplice who only went along with the burglary/robbery because he was afraid of Feeney. But the trial court rejected that testimony because it was inconsistent with Edwards's statement to the police, and it was not credible given how close Edwards and Feeney were at the time of the robbery. As a reviewing tribunal, we cannot second-guess the court's

credibility determination. (*People v. Jackson* (2014) 58 Cal.4th 724, 749; *People v. Baker* (2005) 126 Cal.App.4th 463, 469.)

For all these reasons, we conclude there is substantial evidence to support the trial court's ultimate finding that Edwards committed murder as defined under the current felony-murder rule. No cause for reversal has been shown.[4]

## DISPOSTITION

The trial court's postjudgment order denying Edwards's petition for resentencing is affirmed.

GOODING, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

DELANEY, J.

---

[4] In the trial court, the prosecution argued Edwards was also ineligible for resentencing on the alternative theory he directly aided and abetted Feeney in murdering Kim. Like the trial court, we decline to consider that argument, due to the strength of the prosecution's felony-murder theory.